**SANDERSON FARMS, INC. and Perdue Farms, Inc.,**
**Plaintiffs,**

**v.**

**TYSON FOODS, INC., Defendant.**

**Civil Case No. RDB–08–210.**

United States District Court,
D. Maryland.

April 22, 2008.

Randall Karl Miller, Arnold and Porter LLP, McLean, VA, Nicholas M. Depalma, Ross S. Goldstein, Arnold and Porter LLP, Washington, DC, for Plaintiffs.

Helene D. Jaffe, Laura J. Protzmann, Randi W. Singer, Weil Gotshal and Manges LLP, New York, NY, John J. Connolly, William J. Murphy, Murphy and Shaffer LLC, Baltimore, MD, Joshua D. Janow, Weil Gotshal and Manges LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

RICHARD D. BENNETT, District Judge.

Plaintiffs Sanderson Farms, Inc. ("Sanderson") and Perdue Farms, Inc. ("Perdue") (collectively, "Plaintiffs") bring this suit against their competitor, Tyson Foods, Inc. ("Tyson" or "Defendant"), alleging violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs' Amended Complaint alleges that Tyson's advertisements containing the claims "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans" are false and misleading to the consumer. Plaintiffs specifically allege that Tyson uses ionophores in its chicken feed and that ionophores are antibiotics.

Pending before this Court is Plaintiffs' Supplemental Motion for a Preliminary Injunction. Plaintiffs' Motion seeks to require that Tyson immediately cease all non-label advertising using the unqualified "Raised Without Antibiotics" claim and the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim. Plaintiffs' Amended Complaint requests injunctive relief against "any claim, direct or indirect, qualified or unqualified, in words or in substance, that Tyson's chicken is raised without antibiotics."

This Court held a hearing over four days, commencing on Monday, April 7, 2008 and concluding on Thursday, April 10, 2008, to allow the parties to present oral argument, testimony, and evidence.[1] Having heard the testimony of numerous witnesses, including experts proffered by the parties, and having reviewed hundreds of exhibits, this Court finds that consumers are being misled by Tyson's advertisements proclaiming that its chicken is "Raised Without Antibiotics." Based largely on Plaintiffs' consumer survey, this Court also finds that the qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans" is not likely to be understood by a significant portion of the consumer public. This Court further finds that there is a strong likelihood of success by Plaintiffs on the merits of this case when it proceeds to trial. Moreover, this Court finds that the public interest compels the issuance of a preliminary injunction during the pendency of this case. Accordingly, for the reasons set forth in the following findings of fact and conclusions of law, Plaintiffs'

1. The parties also addressed the Defendant's Motion to Dismiss (Paper No. 50), which was denied on the record on April 10, 2008. That denial was supplemented by a Memorandum Opinion (Paper No. 72) and accompanying Order (Paper No. 73) issued by this Court on April 15, 2008, 549 F.Supp.2d 708, 2008 WL 1733607.

Supplemental Motion for a Preliminary Injunction is GRANTED.

## FINDINGS OF FACT

At the hearing, Plaintiffs offered the testimony of the following witnesses: 1) Dr. Bruce Stewart Brown, Perdue's Vice President of Food Safety and Quality; 2) Hilary Burroughs, Sanderson's Manager of Marketing; 3) John Bartelme, Perdue's Chief Marketing Officer; 4) Michael B. Mazis, Ph.D., Professor of Marketing at American University's Kogod School of Business; and 5) David Hogberg, Tyson's Senior Vice President of Product Marketing.[2] Defendant offered the testimony of the following witnesses: 1) Steve Roth, a market research consultant; 2) Dr. Patrick Pilkington, Tyson's Vice President of State and Government Affairs; and 3) David Hogberg. In addition, both parties submitted a substantial amount of evidence, with hundreds of exhibits being introduced.

## I. Ionophores, the USDA, and Tyson's Labels

### A. Ionophores Are Antibiotics

It is undisputed in this case that ionophores are antibiotics. The United States Department of Agriculture ("USDA"), the Food and Drug Administration ("FDA"), and the American Veterinary Medical Association ("AVMA") are all in agreement on this point. The Food Safety and Inspection Service ("FSIS"), the USDA agency to which Congress has delegated the authority to regulate poultry labels, confirmed this fact on several occasions. After FSIS notified Tyson in September 2007 of its classification of ionophores as antibiotics, it reiterated its position on December 19, 2007, explaining as follows:

> It is longstanding FSIS policy that ionophores are antibiotics because they meet the AVMA definition. The Food and Drug Administration (FDA) agrees that by strict definition, ionophores are antibiotics thus; poultry meat from birds to which ionophores have been administered is not eligible to bear a "RWA" claim.

(Pls.' Ex. 1.)

Moreover, both Plaintiffs' and Defendant's witnesses uniformly testified that ionophores are antibiotics. Dr. Bruce Stewart Brown, Perdue's Vice President of Food Safety and Quality, testified that it is indisputable that ionophores are antibiotics, as the scientific literature supporting this conclusion is voluminous and consistent. Dr. Patrick Pilkington, Tyson's Vice President of State and Government Affairs, acknowledged that ionophores are antibiotics because the FDA classifies them as such. David Hogberg, Tyson's Senior Vice President of Product Marketing, also acknowledged that ionophores are antibiotics.

The potential that humans might develop antibiotic resistance is behind the public's fear of so-called "superbugs," strains of bacteria that become impervious to antibiotic treatment. Because ionophores are not used in human drugs, however, the use of ionophores in chicken products presents only a minuscule threat to antibiotic resistance in humans. Dr. Pilkington testified that the inability of ionophores to cause antibiotic resistance in humans is as close to a scientific certainty as possible, although he could not rule out the possibility.[3]

---

**2.** Plaintiffs' counsel read into the record portions of Walter Leggett's deposition in lieu of his live testimony. Mr. Leggett took the photographs introduced as evidence by Plaintiffs.

**3.** Dr. Pilkington acknowledged that fluoroquinolones, once thought by experts to have no impact on human antibiotic resistance, were pulled for use by the FDA when it was

## B. The Chicken Industry and Ionophores

All three chicken producers in this case—Sanderson, Perdue, and Tyson—use ionophores in their chicken feed. In fact, the use of ionophores is a widespread industry practice. Ionophores effectively prevent coccidiosis, a disease caused by a protozoan-type parasite that lives and multiplies in the intestinal tract of animals, including chicken. Coccidiosis may cause severe symptoms, such as the inhibition of food digestion and nutrient absorption, as well as dehydration and blood loss. Coccidiosis may also result in death. The spread of coccidiosis is a significant concern in the industry.

In addition to using ionophores in its chicken feed, it was clearly established at the hearing that Tyson injects a vaccine containing antibiotics into its chicken eggs two or three days before the egg hatches. Tyson technically defines "Raised Without Antibiotics" to mean from hatch until slaughter, a definition that was not revealed in Tyson's USDA application for label approval. Tyson also does not inform the consumer public that the term "Raised" does not refer to the period before hatch, nor does Tyson inform the consumer public that it injects its chicken eggs with antibiotics.

Among the three chicken producers involved in this case, only Perdue's Harvestland brand does not use any antibiotics at any time. Therefore, Perdue truthfully markets this brand using the slogan "No Antibiotics Ever." Harvestland chicken products are more expensive for Perdue to produce in terms of both husbandry and raising, because, without ionophores, costly precautions are needed to prevent against the risk of coccidiosis. This increased cost is passed to the consumer in the form of higher retail prices, a price premium that certain consumers are willing to pay for antibiotic-free chicken.

The evidence established that Tyson is able to directly compete with Perdue's more expensive Harvestland brand by using the unqualified "Raised Without Antibiotics" claim and the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim. This Court is satisfied by a preponderance of the evidence that consumers are misled into believing that Tyson's mass-marketed chicken and Perdue's specialty chicken are both antibiotic-free, when, in fact, Tyson feeds its chicken ionophores and injects its chicken eggs with antibiotics. Tyson executives have acknowledged that this permits them to "price up," meaning that the company can raise the price of its "Raised Without Antibiotics" chicken without seeing a corresponding decrease in sales figures.

## C. FSIS Approves and Subsequently Revokes Tyson's "Raised Without Antibiotics" Label

The Food Safety and Inspection Service erroneously approved Tyson's unqualified "Raised Without Antibiotics" label application on May 16, 2007. (Def.'s Exs. 65–68.) Tyson's application listed three ionophores (salinomycin, narasin, and monensin) in the feed ingredient list. This approval resulted in Perdue seeking similar agency approval for the same label language.[4] (Def.'s Exs. 173–177.)

---

learned that they did, in fact, impact human antibiotic resistance.

4. Perdue's application remains pending. This is highly unusual, as most applications are resolved within a week. Dr. Brown and John

Bartelme both testified that it is industry practice to engage the USDA in dialogue through the application process. By reviewing which applications are approved and

On September 12, 2007, FSIS unambiguously informed Tyson that it had made a mistake and intended to revoke its prior approval. According to a letter drafted on September 26, 2007 by Tyson's outside counsel, Nancy S. Bryson, the agency had "contacted Tyson [on September 12, 2007] to advise that FSIS had subsequently determined that approval of the ["Raised Without Antibiotics"] labels was a mistake and should be rescinded." (Def.'s Ex. 62.) Therefore, as early as September 12, 2007, Tyson was on clear notice that FSIS believed it had made a mistake and intended to revoke its approval.

On September 19, 2007, Tyson executives, along with Ms. Bryson, met with FSIS officials. After the meeting, FSIS permitted Tyson to formally respond to its concerns, which Tyson did by way of Ms. Bryson's September 26, 2007 letter. On November 6, 2007, Philip S. Derfler, Assistant Administrator of FSIS, replied to Ms. Bryson. In the letter, Mr. Derfler, on behalf of FSIS, stated that

> [i]t is longstanding FSIS policy that ionophores are antibiotics and, therefore, FSIS has not approved labels bearing a "Raised Without Antibiotics" claim if the source animals were fed ionophores. The Tyson labels at issue were thus approved in error by FSIS staff. Accordingly, we advised Tyson that FSIS intended to revoke their approval. Your letter dated September 26, 2007, asks us to reconsider this decision and to permit the continued use of these labels.

(Def.'s Ex. 35.) Mr. Derfler formally denied Tyson's request for reconsideration: "Because ionophores are antibiotics under the AVMA definition, FSIS will not change its longstanding policy regarding ionophores." (*Id.*) FSIS did, however, provide four different options to Tyson: 1) remove all "Raised Without Antibiotics" labels within forty-five days; 2) stop using ionophores in its feed formulation, in which case the "Raised Without Antibiotics" label would be technically accurate; 3) petition FSIS to initiate a public notice and comment process on the use of ionophores in poultry and meat; or 4) submit a revised label application. (*Id.*)

### D. FSIS Approves a Qualified "Raised Without Antibiotics" Label

On December 18, 2007, Tyson submitted an application to FSIS seeking approval of a revised label containing qualifying language. On December 19, 2007, FSIS approved Tyson's application seeking permission to use "Raised Without Antibiotics that impact antibiotic resistance in humans" on its labels.

On January 7, 2008, the Under Secretary of the USDA, Richard A. Raymond, sent a letter to the Senior Vice President of Tyson, Archie Shaffer III, confirming that Tyson and the USDA "reached an agreement" on the qualified label. (Def.'s Ex. 36.) Mr. Raymond stated that FSIS believed the qualified "Raised Without Antibiotics" claim described "the situation in a truthful and non-misleading way." (*Id.*) The letter also indicated that FSIS would be willing to grant a period of time for Tyson to transition from the unqualified label to the qualified label. On February 25, 2008, FSIS formally approved Tyson's temporary use of the unqualified "Raised Without Antibiotics" through a date that has been redacted for this litigation.

### II. Tyson's Aggressive Advertising Campaign

During the same time period that Tyson was actively involved with the USDA in having both the unqualified and qualified

which are denied, a company can glean

USDA's internal policy.

language approved for use on its labels, it was also incorporating both the unqualified and qualified language into a multimillion-dollar nationwide advertisement campaign that utilized television, radio, billboards, print media, posters, and point-of-purchase materials.

## A. Tyson's Advertising Campaign Uses the Unqualified "Raised Without Antibiotics" Claim

After Tyson's unqualified "Raised Without Antibiotics" claim was initially approved by FSIS, the company initiated a multimedia advertising campaign that was internally termed "Project Sting." A subsection of Project Sting, the "Thank You" campaign, placed significant importance on the "Raised Without Antibiotics" language. The advertisements uniformly featured smiling children, often accompanied by a parent. Many of the advertisements included a heading in large print declaring "Chicken your family deserves, raised without antibiotics." (*See, e.g.*, Pls.' Exs. 14–18.) Project Sting was clearly intended to "[s]trengthen [the] emotional connection to [the] Tyson brand" by appealing to the public's safety and health concerns. (Pls.' Ex. 122.)

Tyson received overwhelmingly positive consumer feedback and believed this multimedia campaign was a large-scale success. From the advertisements, consumers understood that Tyson did not use antibiotics, and many consumers indicated that Tyson's chicken was "better" or "safer" than competitors' chicken. (Pls.' Ex. 119.) After conducting market research in the form of consumer reaction groups, Mr. Hogberg relayed to coworkers specific consumer quotes that he believed "summarize[d] how this campaign makes people feel[.]" (*Id.*) Among the sample quotes was the following: "It [Tyson's 'Raised Without Antibiotics' chicken] is safer chicken

than others." (*Id.*) In a separate internal document, Tyson quoted another consumer as saying the following: "[Tyson's 'Raised Without Antibiotics' chicken] has made me very happy as I am a cancer survivor and I believe that all the antibiotics and artificial ingredients contribute to this major disease." (Pls.' Ex. 31.)

Tyson's data also indicated that nine out of ten consumers considered it important to have antibiotic-free chicken; in fact, it was the second most important claim that consumers looked for when shopping for chicken. (Pls.' Exs. 122, 126.) As a result of the advertising campaign, sales of Tyson chicken increased by almost thirty-five million pounds. (Pls.' Ex. 95.) The "Raised Without Antibiotics" advertising campaign was internally described as having a "dramatic" effect on sales. (Pls.' Ex. 108.)

Project Sting's success is also strongly corroborated by the fact that advertisements containing the unqualified "Raised Without Antibiotics" claim remained in the marketplace months after September 12, 2007, the date in which the USDA clearly communicated that it had made a mistake in approving the label. Indeed, as late as November 30, 2007, weeks after the USDA refused to reconsider its revocation, Mr. Hogberg was telling other Tyson employees that "no one should be holding up anything because of the RWA labeling issue." (Pls.' Ex. 108.) Indeed, he was encouraging others to "GO! GO! GO!" onward with the campaign. (*Id.*) This Court finds that Tyson's continuation of Project Sting was done with full knowledge that the USDA intended to revoke the unqualified "Raised Without Antibiotics" label. Indeed, Mr. Hogberg's "GO! GO! GO!" directive is demonstrated by the fact that Tyson purchased additional television advertisements featuring the "Raised Without Antibiotics" language on September

27, 2007, to run through January 20, 2008. This decision was made despite the fact that the USDA unambiguously indicated its intent to revoke the unqualified "Raised Without Antibiotics" label.

Moreover, Tyson distributed point-of-purchase materials to supermarkets across the country. Hilary Burroughs of Sanderson Farms attached sixty-one photographs to her affidavit that purport to show point-of-purchase materials with the unqualified "Raised Without Antibiotics" language. The photographs were all taken between January 29, 2008 and February 18, 2008, in stores located in seven states (Alabama, Arizona, California, Colorado, Mississippi, Georgia, and South Carolina).[5] Despite Tyson having constant communication with the USDA from September 2007 until December 2007, Tyson took no action to remove unqualified point-of-purchase materials from the market until February 28, 2008. On that date, Tyson sent out an internal "action notice" intended to begin the phase out all point-of-purchase materials that contained the unqualified "Raised Without Antibiotics" language. Mr. Hogberg, Senior Vice President of Product Marketing, testified about this delay, and this Court finds his explanation unacceptable. It is quite clear to this Court that it was in Tyson's financial interest to delay the phase-out period as long as possible.[6]

Additional advertisements containing the unqualified "Raised Without Antibiot-

ics" language appeared in other media outlets long after Tyson's original label was revoked by FSIS. A billboard in Mississippi containing the unqualified "Raised Without Antibiotics" language was not taken down until mid-January 2008. (Pls.' Ex. 110.) Ironically, Joe Sanderson, the Chairman and CEO of Sanderson Farms, received at his home a retail store circular advertisement containing Tyson chicken coupons that included unqualified "Raised Without Antibiotics" language during the week of March 9, 2008 (Pls.' Ex. 117), approximately *six months* after Tyson received unambiguous notice from the USDA that the unqualified label would be revoked and *five months* after it was made clear to Tyson that the USDA, FDA, and the AVMA all agreed that ionophores were antibiotics. Although Tyson did not pay for the circular advertisement, it is certainly well within the company's power to insist, with little more than a phone call or email, that retail stores cease all use of the unqualified claim in circular advertisement.

**B. Tyson Begins Using Variations of the Qualified "Raised Without Antibiotics" Claim**

Further evidencing the aggressiveness of its marketing campaign, Tyson began purchasing advertisements using qualified "Raised With Antibiotics" language before FSIS approved Tyson's application on December 19, 2008. For this reason, many of the most recent Tyson advertisements con-

---

**5.** Defendant argued in support of its Motion to Dismiss (Paper No. 50) that point-of-purchase materials are beyond the scope of Plaintiffs' Amended Complaint because they are exclusively within the purview of the USDA under the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451, *et seq.* Addressing the qualified claim, this Court determined in its Memorandum Opinion dated April 14, 2008 (Paper No. 72) that "Plaintiffs' Amended Complaint fairly encompasses any labeling that, despite including language approved by the USDA, contains additional images and

promotional slogans that effectively turn the labeling into an advertisement." (Mem. Op. 15.)

**6.** Mr. Hogberg testified that Tyson set an internal deadline to remove all point-of-purchase materials using the unqualified "Raised Without Antibiotics" language from the marketplace no later than April 14, 2008, before the temporary window authorized by FSIS had expired.

tain qualifying language that differs from the approved qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans."

For example, the March/April 2008 edition of Weight Watchers magazine contains an advertisement using the language "raised without antibiotics that *create* antibiotic resistance in humans." (Pls.' Exs. 70–71. (emphasis added)) Other magazine advertisements and free-standing newspaper inserts purchased by Tyson do not include the qualifying language immediately following the unqualified "Raised Without Antibiotics" claim. For instance, in some advertisements, the unqualified claim was followed by an asterisk, leading the reader elsewhere on the page to a similar, but not USDA-approved, qualification typed in small print. (Def.'s Exs. 47–48.) This Court finds that the addition of qualifying language does little to correct the initial deception resulting from the early stages of the Project Sting campaign.

### C. Tyson's Raised Without Antibiotics Advertising Campaign Has a Negative Impact on Sanderson and Perdue

Tyson's advertising campaign correspondingly had a negative financial impact on both Sanderson and Perdue. Ms. Burroughs testified that Sanderson lost approximately $4.1 million as a result of Tyson's advertising campaign utilizing the unqualified and qualified "Raised Without Antibiotics" claims. (Pls.' Ex. 47.) She testified that a large supermarket retail account that had been using Sanderson for a decade switched to Tyson during the time period Tyson was airing the "Raised Without Antibiotics" advertisements. Despite increased revenues in the final months of 2007, Sanderson's revenues and sales have decreased thus far in 2008. As far as the consumer effect, Ms. Burroughs testified that it typically takes eight to twelve months for an advertising campaign to actually penetrate the market, so the largest consumer effect of Tyson's "Raised Without Antibiotics" campaign will not be felt by Sanderson for some time.

Mr. Bartelme testified that Tyson's advertising campaign has been a "big problem" for Perdue, resulting in "truckloads of lost volume." Perdue has lost three major retail accounts to Tyson as a result of Tyson's "Raised Without Antibiotics" advertising campaign, causing a net loss to the company of approximately $10 million. (Pls.' Exs. 46, 116.) Unlike Sanderson, Perdue did not receive any new accounts during the same time period.

At the four-day hearing, evidence was introduced clearly reflecting Tyson's marketing strategy and the financial harm inflicted on Perdue. Internal Tyson documentation indicates that the "Raised Without Antibiotics" advertising campaign had "wrecked Perdue's overall enterprise strategy" and that "elevating the Tyson brand with RWA has also devalued the Perdue brand." (Pls.' Ex. 106.)

### III. Plaintiffs' Consumer Survey

Professor Michael B. Mazis's consumer survey, submitted on Plaintiffs' behalf, presents compelling evidence of consumer confusion with respect to both the unqualified and qualified "Raised Without Antibiotics" claims and stands uncontradicted in all important respects. Professor Mazis's testimony at the four-day hearing also clearly established that the qualified language is not understood by a substantial percentage of consumers.

The consumer survey included 608 consumers in twenty-eight shopping malls

across the United States.[7] The 608 participants were broken down into four equally distributed cells, each with approximately 150 people. The participants were assigned randomly to the four cells. Each cell was shown a different stimulus. The first two cells were shown an unqualified "Raised Without Antibiotics" Tyson advertisement—the first cell was shown a television commercial and the second cell was shown a print stimulus, such as would appear in a magazine. The third cell was shown a print stimulus with the qualified "Raised Without Antibiotics" claim, using the language approved by the USDA, *i.e.*, "Raised Without Antibiotics that impact antibiotic resistance in humans." The fourth cell was shown a control print stimulus containing the following promotional statement: "chicken with great taste, high quality and unmatched variety." The fourth cell was not shown anything relating to Tyson's "Raised Without Antibiotics" claim, whether unqualified or qualified.

Professor Mazis reached two conclusions based on the consumer survey. First, the individuals that participated in the survey largely responded the same way to the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim as they did to the unqualified "Raised Without Antibiotics" claim. Second, participants viewed both the unqualified and qualified claims as implying that Tyson's chicken is safer and healthier than competitors' chicken.[8]

### A. Open–Ended Questions—Participants Interpreted the Unqualified Language and the Qualified Language the Same

Participants were asked "[w]hat is the main idea that the advertisement is trying to communicate?" Respondents who indicated that the advertisement communicated something about Tyson's chicken and antibiotics were then asked "[w]hat does the advertisement imply or state about Tyson and antibiotics?" Professor Mazis concluded from the responses to these open-ended questions that consumers process the "unqualified" and "qualified" messages in the same fashion. In short,

7. Professor Mazis's consumer survey was completed with sufficient procedures to ensure accuracy. Participants qualified for the survey if they had purchased fresh raw chicken in the past three months and expected to purchase fresh raw chicken in the next three months. Potential respondents were excluded if (a) they or members of their households worked for an advertising agency or public relations firm, a marketing research firm, a law firm, or a manufacturer, distributor, or retailer of food products, or (b) if they wore eyeglasses or contact lenses but did not have their corrective eye wear with them at the time of the interview. The study was "double blind," in that neither the interviewers nor the respondents were aware of the identity of the client or the purpose of the study. The responses to all questions were then entered into a data file using 100% keypunch verification—*i.e.*, all data were keypunched twice to avoid any errors.

8. Steve Roth testified for Defendant regarding Professor Mazis's consumer survey. This Court finds his testimony to be of limited value. More importantly, his testimony did not cast any doubt on Professor Mazis's findings. To a large extent, the thrust of Mr. Roth's testimony was simply that he would have asked more open-ended questions because he prefers them over close-ended questions. On cross examination, he admitted that more participants viewed Tyson's chicken as "better" or "safer" than competitors' chicken than he had previously acknowledged on direct examination, and he also admitted that it is statistically significant that over half (54.9%) of respondents in cell three referred to "no antibiotics" without mentioning anything about antibiotic resistance. In fact, he testified that he was aware that 54.9% is greater than what has been deemed sufficient in other Lanham Act cases.

consumers believe that there are no antibiotics given to Tyson's chickens.

In the first cell (unqualified "Raised Without Antibiotics" television commercial), 71.4% of respondents felt that the commercial communicated a "no antibiotics" claim. In the second cell (unqualified "Raised Without Antibiotics" print advertisement), 85.1% of respondents felt that the advertisement communicated a "no antibiotics" claim. In the third cell (qualified "Raised Without Antibiotics" print advertisement), 63.4% of respondents reported that a "no antibiotics" claim was communicated and about half (54.9%) referred to "no antibiotics" without mentioning antibiotic resistance. In addition, 9.2% of respondents mentioned "no antibiotics" and "antibiotic resistance" as separate but related ideas. Quite significant to this Court is the fact that only 4.6% of respondents understood the claim to mean what the experts at the USDA understood it to mean—*i.e.*, that Tyson uses antibiotics, but that the antibiotics it uses do not cause antibiotic resistance in humans.

Professor Mazis testified that the participants appeared to break down the qualified "Raised Without Antibiotics" into two distinct parts. The first part, "Raised Without Antibiotics," was taken literally by participants to mean that Tyson's chicken was not given antibiotics, which is not accurate. The second part of the qualified claim, "that impact antibiotic resistance in humans," was taken by participants to mean that Tyson's chicken does not impact antibiotic resistance in humans *because* Tyson's chicken has no antibiotics, which is also inaccurate. Taken together, participants largely misunderstood the entire qualified claim to mean that Tyson's chicken had no antibiotics and therefore could not impact antibiotic resistance in humans.[9] Indeed, based on Professor Mazis's testimony, this Court finds that the qualifying language may actually serve to reinforce the false impression that Tyson's chicken is antibiotic-free.

### B. Close–Ended Questions—Participants Believed That Tyson's Chicken Was Safer and Healthier

Participants were first asked "[w]hat is the name of the company that put out or sponsored the advertisement that you just looked at?" If the participant answered this question correctly, the following series of additional close-ended questions was asked:

Q2—"What is the main idea that the advertisement is trying to communicate? Anything else?"

Q3—"Does or doesn't the advertisement (TV commercial) imply or state anything about Tyson chicken and antibiotics?" If the respondent answered affirmatively, he or she was also asked question

9. The following sample responses were included in Professor Mazis's expert report (Pls.' Supp. Mot. Prelim. Inj. Ex. 3):

- "These chickens were raised without antibiotics. It does not impact resistance in humans." (# 01202);
- "No antibiotics in chicken. Resistance for us humans." (# 01909);
- "The chicken was raised without antibiotics. Makes humans more resistant." (# 04306);
- "The chicken from Tyson is raised without antibiotics. It cuts down on antibiotics' resistance in humans." (# 07804);

- "That this chicken is raised and fed right, without antibiotics so that people will not become resistant to antibiotics." (# 08617);
- "Chicken without antibiotics. It won't affect your immunity to antibiotics." (# 11612);
- "That their chickens are antibiotic free. It makes us less resistant to them if they don't have them." (# 01215); and
- "That the chickens don't have antibiotics fed to them. That it doesn't affect antibiotic resistance in humans." (# 11610).

Q3A: "What does the advertisement imply or state about Tyson and antibiotics? Anything else?"

Q4—"Does or doesn't the advertisement imply or state anything about Tyson chicken and taste?" If the respondent answered affirmatively, he or she was also asked Q4A: "What does the advertisement imply or state about Tyson and taste? Anything else?"

Question four specifically asked about something entirely unrelated to this lawsuit, *i.e.*, taste, to avoid highlighting the focus of the study.

In analyzing these closed-ended questions, Professor Mazis concluded that the respondents in the "qualified" cell (cell three) provided similar responses to the advertisements as respondents in the two "unqualified" cells (cells one and two). In response to Q3, 85.1% and 79.1% of respondents in the two "unqualified" cells thought the advertisement they had seen implied or stated something about Tyson and antibiotics, while 81.0% of respondents in the "unqualified" cell answered the same way.

Respondents were then told that a series of statements would be read to them, some, all or none of which may have been implied by or stated in the Tyson advertisement. The respondent was then told to answer: (1) yes, the statement was implied; (2) no, the statement was not implied; (3) I don't know whether the state-

ment was implied; or (4) no opinion. The respondent was then read the following statements, the order of which was rotated differently for each respondent:

- Tyson chicken is fresher than other chicken
- Tyson chicken is safer than other chicken
- Tyson chicken contains more protein than other chicken
- Tyson chicken is better for you than other chicken
- Tyson chicken tastes better than other chicken
- Tyson chicken is more healthful than other chicken

The questions asking about whether Tyson's chicken was safer, better for you, and more healthful were the most relevant to this lawsuit. The other questions were asked so that the purpose of the questions remained unknown.

First, Professor Mazis calculated the percentage of people who believed that Tyson's chicken was safer, more healthful, or better for you. Next, he adjusted the results for "noise" (*e.g.*, guessing, pre-existing beliefs, suggestive question wording, bias, etc.) by subtracting the percentage of positive responses obtained from the control cell. The following chart summarizes the consumer survey data, with the bold-faced number indicating the final results of the survey:

| | Tyson chicken is safer than other chicken | Tyson chicken is more healthful than other chicken | Tyson chicken is better for you than other chicken |
|---|---|---|---|
| Cell One— "Unqualified" TV | 65.6% - 29.9% = **35.7%** | 72.1% - 46.3% = **25.8%** | 60.4% - 46.3% = **14.1%** |
| Cell Two— "Unqualified" Print | 59.1% - 29.9% = **29.2%** | 68.2% - 46.3% = **21.9%** | 57.1% - 46.3% = **10.8%** |
| Cell Three— "Qualified" Print | 63.4% - 29.9% = **33.5%** | 70.6% - 46.3% = **24.3%** | 60.1% - 46.3% = **13.8%** |

Based on the responses controlled for noise, about one-third of all respondents in cells one, two and three—including both unqualified and qualified language—agreed that the advertisement communicated that Tyson's chicken is safer than other chicken, and about one-quarter of respondents in cells one, two, and three—again, including both unqualified and qualified language—agreed that the advertisement communicated that Tyson's chicken is more healthful. Because all three chicken producers in this action use ionophores, these figures represent nothing less than consumer deception about the relative safety and health of Tyson's chicken. Moreover, the percentages remained consistent for all three implied claims of superiority (safer, more healthful, and better for you), regardless of whether the language was unqualified (cells one and two) or qualified (cell three). In fact, for print advertisements (cells two and three), a greater percentage of respondents who viewed the qualified language believed that it contained an implied claim of superiority than did respondents who viewed the unqualified language.

### CONCLUSIONS OF LAW

Under Rule 65 of the Federal Rules of Civil Procedure, the decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court. *Hughes Network Sys. v. Inter-Digital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir.1994). To determine whether a preliminary injunction is appropriate, the court must apply the four-factor hardship balancing test established by the United States Court of Appeals for the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977). The four *Blackwelder* factors are 1) the likelihood of irreparable harm to the plaintiff if injunc-

tive relief is denied, 2) the likelihood of harm to the defendant if injunctive relief is granted, 3) the likelihood that the plaintiff will succeed on the merits, and 4) the public interest. *Id.* at 195; *see also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991).

In *Scotts Co. v. United Industries Corp.*, 315 F.3d 264 (4th Cir.2002), the Fourth Circuit summarized the proper analysis to determine whether a preliminary injunction should be granted:

> When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. If the balance of the hardships "tips decidedly in favor of the plaintiff," ... then typically it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," .... But if the balance of hardships is substantially equal as between the plaintiff and defendant, then "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success."

*Id.* at 271 (internal citations omitted); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 526 (4th Cir.2003) (stating that the *Blackwelder* test represents a "sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa").

■■ Applying the *Blackwelder* factors, this Court concludes that Plaintiffs' Supplemental Motion for Preliminary Injunction should be granted. The preliminary injunction proceeding in this case was extensive. Although naturally incomplete at this stage in the litigation, the record is hardly insufficient and this Court does not reach its legal conclusions in haste. *See Sole v. Wyner*, —— U.S. ——, 127 S.Ct. 2188, 2195, 167 L.Ed.2d 1069 (2007) ("In some cases, the proceedings prior to a grant of temporary relief are searching; in others, little time and resources are spent on the threshold contest.").

## I. Likelihood of Irreparable Harm to Plaintiffs If Injunctive Relief Is Denied

Based on the consumer survey, this Court finds that Plaintiffs have demonstrated that consumers are in fact misled by Defendant's advertisements. This Court also finds that, even in the absence of a presumption, the continuation of Defendant's advertisements during the pendency of this case will cause further harm that is neither "remote nor speculative, but actual and imminent." *Scotts Co.*, 315 F.3d at 271.

## A. Evidence of Consumer Confusion

In *Scotts Co.*, the Fourth Circuit "did not reach the issue [of an irreparable harm presumption] in a false advertising context because the plaintiff had failed to make a prima facie showing of consumer confusion." *Pediamed Pharms., Inc. v. Breckenridge Pharm., Inc.*, 419 F.Supp.2d 715 (D.Md.2006) (citing *Scotts Co.*, 315 F.3d at 272). The presumption that was not addressed by the Fourth Circuit was discussed in *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir.1998), where the United States Court of Appeals for the Eighth Circuit suggested that a presumption of irreparable harm should be applied in all Lanham Act false advertising cases where the plaintiff has established a tendency to deceive.[10] *Id.* at 1183.

The Fourth Circuit noted that other district courts in this circuit have applied the *United Industries* presumption. *See Scotts Co.*, 315 F.3d at 273 (citing *JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 128 F.Supp.2d 926, 948 (E.D.Va.2001) ("[A] demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement."), *aff'd in part, vacated in part, and remanded*, 28 Fed.Appx. 207 (4th Cir.2002) and *Black & Decker (U.S.) Inc. v. Pro–Tech Power Inc.*,

---

**10.** As the Fourth Circuit explained in *Scotts Co.*, some courts limit the presumption to cases involving direct comparative advertising. 315 F.3d at 273–74; *see Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir.1994) (explaining that the presumption of irreparable harm is generally limited to cases involving false comparative advertising); *Mutual Pharm. Co. v. Ivax Pharms., Inc.*, 459 F.Supp.2d 925, 944–45 (C.D.Cal.2006) ("Outside the context of comparative advertisements (that is, those that make no direct reference to a competitor's product), a presumption of irreparable injury to a party is unwarranted."); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:37 at 27–75 to 27–76 (4th ed. 2006)

("Where the challenged advertising makes a misleading comparison to a competitor's product irreparable harm is presumed. But if the false advertising is non-comparative and makes no direct reference to a competitor's product, irreparable harm is not presumed.").

Although Plaintiffs' consumer survey indicates that one third of consumers believe that Defendant's advertisements make an implied claim of safety superiority, and that one fourth of consumers believe Defendant's advertisements make an implied claim of health superiority, the claims are clearly not direct claims of superiority. Therefore, the comparative advertising presumption is inapplicable in this case.

26 F.Supp.2d 834, 862 (E.D.Va.1998) ("Courts have explained that a demonstration that the competitor's advertising tends to mislead consumers satisfies the Lanham Act's irreparable harm requirement.")). In *JTH Tax*, the district court explained that, "[b]ecause it is 'virtually impossible to prove that so much of one's sales will be lost as a direct result of a competitor's advertisement,' a demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement." 128 F.Supp.2d at 948 (internal citations omitted).

In this case, unlike in *Scotts Co.*, Plaintiffs have sufficiently demonstrated consumer confusion. There are two distinct aspects to this inquiry, each requiring different quanta of proof: "If the advertising is literally false, no evidence of consumer confusion is required. But if the advertising is impliedly false, the plaintiff must present extrinsic evidence of consumer confusion." *Scotts Co.*, 315 F.3d at 274.

Plaintiffs have established the literal falsity of Defendant's unqualified "Raised Without Antibiotics" claim. Indeed, the evidence before this Court conclusively demonstrates that the United States Department of Agriculture, the Food and Drug Administration, and the American Veterinary Medical Association, as well as the scientific community at large, are all in agreement that ionophores are antibiotics. Having demonstrated the literal falsity of the unqualified "Raised Without Antibiotics" claim and having demonstrated consumer confusion, Plaintiffs have established irreparable harm as to Defendant's unqualified "Raised Without Antibiotics" claim.

Plaintiffs have also established that the qualified "Raised Without Antibiotics" claim leads to consumer confusion. Because the qualified language, "Raised Without Antibiotics that impact antibiotic resistance in humans," was approved for labels by FSIS as being not "false and misleading," *see* Poultry Products Inspection Act, 21 U.S.C. § 457(b)-(c), this Court will not consider the claim to be literally false, at least not at the preliminary injunction stage of this litigation. Nonetheless, Plaintiffs' consumer survey sufficiently demonstrates that "a not insubstantial number of consumers" are likely to be confused or misled. *Johnson & Johnson \* Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir.1992).

Plaintiffs' consumer survey found that 63.4% of respondents reported that the qualified "Raised Without Antibiotics" language meant that Defendant used no antibiotics in its chicken. The consumer survey also found that 54.9% of respondents referred to "no antibiotics" without mentioning anything about the qualifying language "that impact antibiotic resistance in humans." Defendant's own expert witness, Steve Roth, acknowledged during his testimony that these figures far exceed the level of consumer survey evidence usually required by courts. *See, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 594 (3d Cir.2002) ("We believe that survey evidence demonstrating that 15% of the respondents were misled ... is sufficient to establish the 'actual deception or at least a tendency to deceive a substantial portion of the intended audience,' necessary to establish a Lanham Act claim for false or misleading advertising." (internal citation omitted)).[11]

---

11. *See also Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1114 (D.N.J.1987)

(finding that between 22% and 57% of potential consumers being misled was sufficient to

Having heard testimony for four days and having reviewed hundreds of exhibits, this Court is convinced by a preponderance of the evidence that a substantial percentage of consumers are misled by Defendant's advertisements carrying the message "Raised Without Antibiotics that impact antibiotic resistance in humans." The qualifying language does not appear to serve its intended purpose—the consumer is still led to believe that Defendant does not use antibiotics, when in fact Defendant uses ionophores in its chicken feed and injects its chicken eggs with antibiotics. Indeed, the qualification may only serve to reinforce that Defendant's chicken is "Raised Without Antibiotics," a claim that is literally false.

Moreover, Plaintiffs' consumer survey does not suffer from the flaws highlighted by the Fourth Circuit in *Scotts Co*. In *Scotts Co.,* the Fourth Circuit found that the critical issue in the case was not adequately answered by the questions posed in the consumer survey and that the answers given to those questions were ambiguous. *See Scotts Co.,* 315 F.3d at 279. Plaintiffs' consumer survey answers the precise issue in his case, *i.e.,* whether Defendant's qualified "Raised Without Antibiotics" claim misleads the consumer into believing that Defendant does not use antibiotics. Furthermore, the consumer survey answers are not ambiguous—the sample responses underscore the fact that a substantial portion of consumers do not appear to understand that Defendant's chicken is not antibiotic-free. *See supra* note 9 (listing sample responses of survey participants that understood the qualified "Raised Without Antibiotics" advertisements to mean that Defendant did not use antibiotics).

Therefore, this Court credits Plaintiffs' consumer survey and finds that the results establish consumer confusion. Therefore, Plaintiffs have met their burden of establishing the irreparable harm prong of the *Blackwelder* analysis.

## B. Financial Impact on Plaintiffs

Alternatively, even in the absence of any presumption, Plaintiffs have demonstrated that they will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent." *Scotts Co.,* 315 F.3d at 271 (citations omitted). Defendant's advertising campaign has already had a "dramatic" effect on its sales, directly resulting in a thirty-five million pound increase. During the same time period, Defendant's advertisements have had a negative impact on Plaintiffs' respective businesses. Sanderson submitted evidence establishing that it lost a $4.1 million account, and Perdue submitted evidence that it lost three accounts totaling approximately $10 million.

Indeed, Defendant believed that the advertising campaign caused incalculable loss to Perdue. Internal memoranda indicate that Defendant's advertising campaign "wrecked Perdue's overall enterprise strategy" and that "elevating the Tyson brand with RWA has also devalued the Perdue brand." (Pls.' Ex. 106.) This is precisely the sort of loss that the issuance of a preliminary injunction is designed to prevent. As a result, a preliminary injunction would serve to limit the continued gravitation of consumer purchasing decisions towards Defendant's product as a

---

warrant preliminary injunctive relief under the Lanham Act); *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F.Supp. 867, 876 (S.D.N.Y.1980) (finding between 20% and 33% of consumers being deceived sufficient to warrant preliminary injunctive relief);

*McNeilab, Inc. v. Am. Home Prod. Corp.,* 501 F.Supp. 517, 527 (S.D.N.Y.1980) (finding 23% of consumers being confused sufficient to support a claim that the Lanham Act had been violated).

result of the qualified "Raised Without Antibiotics" advertising campaign.

Moreover, there is no evidence before this Court showing that the damage already incurred by Plaintiffs will not be made worse during the pendency of this case. *See Scotts Co.,* 315 F.3d at 283–84 (finding that the plaintiff had not met its burden of "actual and imminent" irreparable harm largely because of a slow industry-specific business cycle during the pendency of the trial). Tellingly, even while the status of the "Raised Without Antibiotics" label was in flux, internal memoranda indicated that "no one should be holding up anything because of the RWA labeling issue" and that employees should "GO! GO! GO!" forward with the advertising campaign. A similarly aggressive position could be taken while Defendant awaits a trial on the merits.

Accordingly, this Court finds that Plaintiff has made a strong showing of irreparable harm if the injunction is denied. Such a showing has been made through evidence of consumer confusion and continued economic harm.

## II. Likelihood of Irreparable Harm to Defendant If Injunctive Relief Is Granted

This Court finds that there is virtually no harm whatsoever to Defendant with respect to non-label advertisements carrying the unqualified "Raised Without Antibiotics" claim. Defendant has informed this Court that they are currently in the process of removing all "Raised Without Antibiotics" advertisements from the marketplace. Thus, a preliminary injunction ensuring that this occurs only reinforces the status quo by way of a court order. On the unqualified "Raised Without Antibiotics" claim, the scale tips decidedly in favor of Plaintiffs.

As to non-label advertisements carrying the qualified "Raised Without Antibiotics" claim, Defendant will undoubtedly incur substantial costs associated with removing advertising from the marketplace upon the issuance of a preliminary injunction,[12] which offsets at least part of the financial harm Plaintiffs argue they will suffer if this Court does not issue a preliminary injunction. Defendant also argues that the issuance of a preliminary injunction would result in "consumer mistrust and the loss of goodwill." (Def.'s Mem. Opp'n Prelim. Inj. 6.)

The Fourth Circuit has admonished district courts not to give short shrift to irreparable harm that may appropriately be characterized as self-inflicted by the defendant. In *Scotts Co.,* the Fourth Circuit explained that "[i]f self-made harm is given substantially less weight, as it was by the district court in this case, then the balance of the harms will almost always favor the plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence." 315 F.3d at 284. This Court does not substantially minimize the harm that might befall Defendant upon the issuance of a preliminary injunction, but it does note that such harm could have been mitigated, if not prevented, through the adop-

---

**12.** The costs will be mitigated by the bond to be posted by Plaintiffs under Rule 65(c) of the Federal Rules of Civil Procedure. In *Scotts Co.,* the Fourth Circuit found that the defendants would "suffer only minimal harm" despite the fact that they "would incur the monetary costs of complying with the injunction by creating new packaging or placing stickers to cover the offending graphic on the existing packaging." 315 F.3d at 285 (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 n. 3 (4th Cir.1999) ("In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.")).

tion of a less aggressive marketing position. The evidence plainly indicates that Defendant's executives identified an opportunity to increase the company's market share and sought to capitalize on that perceived opportunity despite full knowledge of the risk. Mr. Hogberg candidly acknowledged that he continually assessed the risks associated with Defendant's marketing campaign and that Defendant's executives "made the call" to move forward notwithstanding the risks. *See Natura-Lawn of Am., Inc. v. West Group, LLC,* 484 F.Supp.2d 392, 402 (D.Md.2007) (noting that harm created by the defendant's "own willful acts" is "a factor that the court is entitled to consider").

Moreover, not only have Plaintiffs demonstrated that they will suffer irreparable harm if injunctive relief is denied, but, as will be discussed below, Plaintiffs have convinced this Court that there is an extremely high likelihood of success on the merits. As such, the fact that Defendant may suffer some degree of irreparable injury upon the issuance of a preliminary injunction is alone insufficient for this Court to forgo granting it. Therefore, balanced against the harm that will be suffered by Plaintiffs if the preliminary injunction is not issued, this Court finds that the scale tips slightly in Plaintiffs' favor on the qualified "Raised Without Antibiotics" claim.

## III. Likelihood That Plaintiff Will Succeed on the Merits

The Fourth Circuit has explained that "the balance-of-the-hardship question is in-

tertwined with questions about the merits." [13] *Scotts Co.,* 315 F.3d at 272. As noted above, extensive evidence was presented by Sanderson, Perdue, and Tyson during the four-day hearing. Indeed, with the submission of hundreds of exhibits and the testimony of key witnesses, this Court has, in effect, conducted a mini-trial. This Court has based its factual findings on an extensive record, including a comprehensive consumer survey submitted by Plaintiff. For many of the same reasons discussed in the first *Blackwelder* factor, this Court finds that there is a very strong likelihood that Plaintiffs will succeed on the merits in a trial before a jury.

■■■ The elements of a false advertising claim under the Lanham Act are as follows:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

(2) the misrepresentation is material, in that it is likely to influence the purchasing decision;

(3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

(4) the defendant placed the false or misleading statement in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the misrepre-

---

**13.** Indeed, the *Scotts Co.* court found that the plaintiff did not meet its burden under either the irreparable harm prong or the likelihood of success prong for the exact same reason. *See* 315 F.3d at 283 (finding, in the irreparable harm inquiry, that "because we have rejected [the plaintiff's] evidence of consumer confusion (and its various arguments as to why no extrinsic evidence was required), it

follows that the district court erred by applying the presumption of irreparable harm, a presumption that was dependent on [the plaintiff] establishing consumer confusion"); *id.* at 285 (finding that "because the evidence presented by [the plaintiff] is insufficient to show a likelihood of consumer confusion, [the plaintiff] has therefore failed to show a likelihood of success on the merits").

sentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co.,* 315 F.3d 264 at 272 (citing *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 310–11 (1st Cir.), *cert. denied,* 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002)).

With respect to the first element, the unqualified "Raised Without Antibiotics" claim is literally false, and the qualifying language has proven to be of little effect to the consumer, as demonstrated by Plaintiffs' consumer survey. Furthermore, Defendant's advertising does not communicate to the consumer the fact that Defendant injects antibiotics into its chicken eggs two to three days before hatch.

The evidence also demonstrates that Defendant's misrepresentation is material. Nine out of ten consumers considered it important to have antibiotic-free chicken and a claim of antibiotic-free chicken is the second most important claim that consumers looked for when shopping for chicken. Therefore, Plaintiffs are likely to succeed on the second and third elements. The fourth element will be met because Defendant's advertisements were clearly disseminated nationwide. The fifth element will likely be met for the same reasons this Court found that Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.

Defendant again makes the same argument in defense of this motion as it did in support of its Motion to Dismiss, which was denied by this Court by Order dated April 14, 2008 (Paper No. 73.) In short, Defendant argues that "courts repeatedly have rejected Lanham Act claims based upon advertisements that simply repeat information in labeling that a government agency has determined not to be 'false or misleading.' " (Def.'s Mem. Opp'n Prelim. Inj. 6–7.) Defendant relied on cases in-

volving the FDA, an agency with substantially broader jurisdiction than the USDA, the government agency at issue in this case. Unlike the FDA, the USDA does not have congressional authority to review advertisements. Therefore, this Court held that

a non-label false advertising claim brought under the Lanham Act is not precluded because the language on which the claim is based was approved for use on labels by the USDA. The opposite conclusion would extend USDA expertise into an area, *i.e.,* advertising, which the agency has no congressional authority to enter, while at the same time significantly curtailing the congressional protections explicitly accorded to "persons engaged in such commerce" under the Lanham Act.

(Mem. Op. 20.) For the reasons stated in the Memorandum Opinion (Paper No. 72), this argument is without merit.

### IV. The Public Interest

The public interest is served by the issuance of a preliminary injunction in this case. There is a significant and immediate public interest concern when specific advertising misrepresents that a product is something that it is not, even if the product does not pose an immediate health or safety concern. *See Scotts Co.,* 315 F.3d 264 at 286 ("[T]here is a strong public interest in the prevention of misleading advertisements.") (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 587 (3d Cir.2002)).

This Court is satisfied that the consumer public is being misled by Defendant's "Raised Without Antibiotics" advertising. Defendant's chicken is not "Raised Without Antibiotics" when ionophores are used in chicken feed and other antibiotics are injected into the chicken egg two to three days before hatch. This Court, having heard testimony and reviewed voluminous

exhibits and a comprehensive consumer survey, is satisfied that the qualifying language, *i.e.*, "that impact antibiotic resistance in humans," is not understood by a substantial portion of the consumer public. Indeed, it may even reinforce consumer misconception. Defendant has persisted in this advertising effort since September 2007, when the USDA clearly placed Defendant on notice that it intended to revoke its prior label approval because ionophores are antibiotics. The public interest compels that this advertising stop and that a preliminary injunction be issued in this case.

### CONCLUSION

For the reasons stated in this Memorandum Opinion, Plaintiffs' Supplemental Motion for Preliminary Injunction (Paper No. 44) is GRANTED. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, a separate Order detailing the scope of the preliminary injunction follows.

### PRELIMINARY INJUNCTION ORDER

For the reasons stated in the accompanying Memorandum Opinion issued this date, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, this Court, having conducted a hearing over four days between April 7, 2008 and April 10, 2008 and having considered memoranda and oral arguments, as well as testimony and evidence submitted by the parties, finds that Plaintiffs Sanderson Farms, Inc. and Perdue Farms, Inc. will suffer imminent and irreparable harm from non-label advertising being disseminated by Defendant Tyson Foods, Inc., unless Defendant is preliminarily enjoined as set forth in this Order. Accordingly, it is this 22nd day of April 2008, HEREBY ORDERED:

1. That Plaintiffs' Supplemental Motion for a Preliminary Injunction (Paper No. 44) is GRANTED, as follows:

   a. That Defendant must remove any and all non-label advertisements, as defined in paragraphs 1.c and 1.d, containing language claiming that its chicken products are "Raised Without Antibiotics," regardless of whether the statement has qualifying language such as "Raised Without Antibiotics that impact antibiotic resistance in humans";

   b. That Defendant is further enjoined from using non-label advertisements, as defined in paragraphs 1.c and 1.d, containing language claiming that its chicken products are "Raised Without Antibiotics," regardless of whether the statement has qualifying language such as "Raised Without Antibiotics that impact antibiotic resistance in humans," during the pendency of this case;

   c. That non-label advertising consists of television commercials, radio spots, print ads, billboards, circulars, and posters;

   d. That non-label advertising also consists of any and all labeling, including point-of-purchase materials, that contain either the "Raised Without Antibiotics" or "Raised Without Antibiotics that impact antibiotic resistance in humans" language in association with other promotional language and images, regardless of whether such articles are located in proximity to Defendant's chicken products; and

   e. That Defendant's labels are exempt from this Order and consist of language placed immediately upon Defendant's chicken products or container.

2. It is HEREBY FURTHER ORDERED that:

   a. This Order shall take effect at 12:01 a.m., Thursday May 1, 2008, so as to accord Defendant an oppor-

tunity to appeal the issuance of this Preliminary Injunction Order to the United States Court of Appeals for the Fourth Circuit;

b. By 12:01 a.m., Thursday May 1, 2008, Plaintiffs shall post a bond, not to be released unless by further Order of this Court. The amount of the bond will be set by this Court by 5:00 p.m., Friday, April 25, 2008 after the parties have had an opportunity to file submissions on their respective positions on the appropriate amount of the bond;

c. Upon the effective date of this Order, pursuant to Rule 65(d)(2)(C), Defendant shall notify all retailers and other third parties disseminating its advertising of the scope and effect of this Order;

d. This Order shall remain in effect pending a trial in this matter; and

e. The Clerk of this Court transmit copies of this Order and accompanying Memorandum Opinion to counsel for both parties.